Rhonda Lunsford, SBN #219239
P.O. Box 31
San Leandro, CA 94577
(510) 759-9529
rrlunsford@hotmail.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>         Plaintiff,<br><br>    vs.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>         Defendant. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER (TRO)<br>2. REQUEST FOR PRELIMINARY INJUNCTION<br>3. DAMAGES<br>4. JURY TRIAL |

Comes now, JOHN DOE, alleges against The Regents of the University of California, as follows:

**JURISDICTION, VENUE & INTRADISTRICT ASSIGNMENT**

1. This action implicates the following federal and state laws: California Safety Code 1262(b) and (d); Original Medicare; The Patient Protection and Affordable Care Act (hereinafter "ACA") (Public Law 111-148, enacted on March 23, 2010); the Americans with Disabilities Act; Section 504 of the Rehabilitation Act of 1973; California Unruh Civil Rights Act, California Disabled Persons Act (Civ Code Section 54); and California

1
COMPLAINT

Code Section 11135 (Gov. Code Section 12930(f).); and the 14th Amendment to the United States Constitution.

2. This Court has jurisdiction over this Complaint as it involves violations of federal and state law.

3. Venue is appropriate in this Court as complainant resides in this district.

## STATEMENT OF THE CASE

4. Hospitals are required to make arrangements for post-acute care for patients at risk of adverse health outcomes under both Federal and California law.

5. The University of California maintains various campuses and medical centers across California. These campuses and medical centers are subsumed entities of The Regents of the University of California (hereinafter Defendant). Defendant operates the University of San Francisco Medical Center (UCSFMC), a public, academic medical center and a community hospital located at the University of California San Francisco campus. Defendant receives federal funds to support its various programs, including significant funding from the National Institute of Health (NIH).

6. Despite the accolades, Defendant has engaged in unlawful discharge practices as it relates to this Plaintiff. Defendant plans to discharge Plaintiff to home without adequate support on December 30, 2024, which is both unsafe and unlawful. Instead of arranging safe and appropriate post-acute care, Plaintiff has been told to hire private-duty nurses and private caregivers to accommodate his 24/7 care needs, which is neither financially feasible nor safe.

7. Defendant is placing Plaintiff at risk of serious and avoidable harm and limiting Plaintiff's ability to reach optimal medical and functional outcomes.

## CLAIM #1: VIOLATION OF CALIFORNIA HEALTH AND SAFETY LAWS

8. Defendant is violating California Safety Code 1262(b) and (d), by failing to arrange safe and adequate follow-up care that accommodates Plaintiff's care needs and acuity.

9. Plaintiff is battling Scleroderma and Dermatomyositis and is physically disabled.

10. Plaintiff is able to ambulate but currently requires the assistance of two persons to get up and onto a walker. Plaintiff requires two-person assistance for transfers/hoyering and frequent repositioning while in bed to prevent skin breakdown. Plaintiff also currently requires two-person assistance for complex daily wound care. In addition, Plaintiff receives two IV infusions – one three times weekly, and a second bi-weekly.

11. Plaintiff needs rehabilitation therapies to maintain function, strength, and mobility. Plaintiff's care is complicated by the fact that Plaintiff is 6'7" and requires special equipment and considerations to accommodate his stature.

12. Plaintiff is currently inpatient and was admitted on September 10, 2024, from a skilled nursing facility, to treat a "superinfection" and complications from his autoimmune conditions.

13. Plaintiff remains in a "step-down" unit of the hospital due to the complexities of his care needs. In fact, Defendant has relegated Plaintiff's complex wound care to two shifts due to the time and resources it takes to complete it.

14. Plaintiff has expressed that his representative lacks the personal capacity to meet his complex care needs. However, Defendant continues to pressure Plaintiff's representative to take on these tasks.

15. Plaintiff's current hospital stay has been denied by his health insurance carrier (Blue Cross Blue Shield Federal Employee Program). Plaintiff currently requires at least a

long-term acute care (LTAC) level of care. At the same time, Plaintiff's health insurance carrier is also refusing to authorize LTAC care.

16. Plaintiff has asked Defendant multiple times for help with local post-acute placement, yet Defendant claims they are unable to locate viable post-acute facilities.

17. Instead of complying with its legal obligations, Defendant is attempting to displace Plaintiff to El Paso, Texas or possibly to Arizona. Plaintiff was born and raised in California, is a California resident and taxpayer, and has no desire to be displaced.

18. Specifically, on or about November 18, 2024, Plaintiff's representative received a call from an acute rehab (ARU) facility in El Paso, Texas stating that Defendant had referred Plaintiff to the facility for "relocation home" to El Paso. The following day, Plaintiff's representative contacted Defendant to object to displacement to Texas as unacceptable and unsafe. Plaintiff's representative also requested copies of referral forms sent on behalf of Plaintiff over a two-week timeframe, as well as a written discharge plan. No referral forms were ever provided to Plaintiff despite numerous requests.

19. Defendant is refusing to bill Plaintiff's secondary insurance (Medicare) and tertiary insurance (Medi-Cal) coverages to help offset his medical treatment and care. At various times during Plaintiff's hospital stay, including on November 18, 2023, and continuing, Plaintiff and his representative have requested the status of Plaintiff's Medicare and Medi-Cal benefits and whether those coverages have been billed. No billing status was ever provided despite numerous requests.

20. On November 25, 2024, Defendant provided updated list of the facilities contacted on behalf of Plaintiff. It showed that Defendant had contacted exactly ten (10) ARU facilities, three (3) in the bay area, 3 additional facilities in northern and central California, and four (4) in Phoenix and El Paso.

21. On December 6, 2024, Defendant advised Plaintiff that he had been accepted for treatment at El Paso Rehabilitation Hospital and provided Plaintiff with a copy of online reviews of the facility. Defendant thereafter issued Plaintiff an ultimatum to go to El Paso, Texas for ARU or go home. Defendant insisted this was consistent with hospital policy.

22. On December 6, 2024, Plaintiff's representative contacted El Paso Rehabilitation Hospital to inquire into the proposed plan of care and was advised that Plaintiff was not accepted for treatment there. Plaintiff's representative also contacted a second facility on the list provided by Defendant, Las Palmas Rehabilitation Hospital, El Paso. This facility advised that they had also not accepted Plaintiff for treatment. The facility also told Plaintiff's representative that they had not contacted her because Defendant had specifically asked the facility not to call to discuss.

23. Given the discrepancies in the information provided by Defendant, and in order to make an informed decision, Plaintiff and his representative asked for additional clarification from Defendant on the proposed displacement on or about December 7, 2024. Defendant stated that Plaintiff would be transported to Texas and back to California via air ambulance. When asked how exactly Plaintiff would be transported (e.g. via gurney, via chair, etc.), Defendant did not know. Plaintiff and his representative also requested documentation from the facility directly that confirmed Plaintiff was indeed accepted for treatment, the proposed plan of care, and that the treatment had been authorized by insurance.

24. Instead of providing information from the facility and/or the insurance company, Defendant provided "answers" in writing on or about December 10, 2024. The information provided by Defendant indicated that El Paso Rehab had requested authorization, which was false. The notes also stated that air transport to El Paso was

requested but not authorized, and Plaintiff's return from El Paso was, "dependent on completing a course of therapy" in ARU. The information provided was confusing and suggested a lack of a return plan. Overall, the notes showed that there was no confirmed, authorized plan for Plaintiff to accept or decline at all, making the ultimatum issued to Plaintiff on December 6, 2024, a ruse.

25. The notes also stated that, "Multiple ARU have evaluated our rehab notes and feel confident that [Plaintiff] can progress back to the community after a short stay at ARU with daily intensive rehabilitation." However, Defendant has failed to provide any information to Plaintiff as to which facilities these might be so that Plaintiff and his representative can follow-up, despite Plaintiffs numerous requests for this information.

26. On December 10, 2024, Plaintiff's representative received an expanded list of facilities contacted on behalf of Plaintiff. Plaintiff's representative called the El Paso number identified on the revised list and reached a representative from PAM, a third rehabilitation facility located in El Paso. PAM was not listed on any prior lists provided by Defendant. The representative from PAM indicated that the facility was contacted by Defendant for ARU in Texas and that the average stay was 14 (fourteen) days. The representative stated that she had sent Plaintiff's information up to "corporate" to negotiate a carve out for infusion medications with Plaintiff's insurance, but that authorization had not been requested. When asked about the discharge plan for Plaintiff after 14 (fourteen) days given Plaintiff is a California resident and desires to remain in California, the representative stated that case managers in Texas would try to get Plaintiff "as close to home" as possible to home, but was unable to confirm Plaintiff could return home to California.

27. Based on the discrepancies and misrepresentations in the information provided by Defendant regarding the proposed displacement, Plaintiff and his representative formally

declined the proposed displacement to El Paso as unsafe and unacceptable. Plaintiff noted that he was discharged by Defendant in 2023 to Arizona under similar circumstances and experienced a severe flare and setbacks that he is still recovering from.

28. On December 10, 2024, Plaintiff's representative contacted Alta Bates Rehabilitation in Oakland, CA to discuss barriers to admission. The facility indicated that the information received from Defendant regarding Plaintiff, including Plaintiff's mobility and goals, was confusing. Alta Bates asked several questions to clarify Plaintiff's physical condition, level of mobility, and rehabilitation goals, and stated the facility would call Defendant again and possibly talk to the physical therapy department for clarification. Plaintiff understands that Alta Bates did reach back out to Defendant and ultimately decided they would be unable to accept him for treatment. However, it remains unclear what information was provided by Defendant to Alta Bates or any other facility. Again, Plaintiff and his representative have requested this information, which was never provided.

29. On or about December 13, 2024, Defendant advised of Plaintiff's "tentative" discharge to home on December 30, 2024, and provided brochures for private duty nursing.

30. On or about December 14, 2024 and continuing, Plaintiff and Plaintiff's representative requested a copy of Defendant's discharge policy. A copy of the policy was ultimately provided on December 27, 2024. The policy contains no mention of electing between unsafe discharge options. Contrarily, the policy sets forth discharge planning goals designed to assist patients in moving towards the greatest level of independence, that are patient focused, and prioritize patient and family preferences.

31. Plaintiff has repeatedly told Defendant that constant discussions about discharge and displacement have caused tremendous physical and mental stress, including heartburn and blood pressure spikes.

32. Plaintiff continues to request assistance with locating appropriate placement in the local area that can meet his complex care needs. Plaintiff has over one hundred (100) days of skilled nursing facility (SNF) benefit remaining.

33. Plaintiff has a pending appeal with his employer for his current denied hospital stay.

34. Plaintiff is also on a priority waiting list with the Medi-Cal Home and Community Based Alternatives (HCBA) Waiver program that provides nursing and facility assistance to the medically complex and medically fragile in California. If displaced to Texas, Plaintiff may lose eligibility for waiver benefits and drop to the bottom of an almost 5,500-person waiting list to regain those benefits.

35. Defendant is failing to ensure appropriate placement that meets Plaintiff's care needs and acuity, thereby forcing Plaintiff into a situation that compromises health and safety.

WHEREFORE, Plaintiff has been damaged and prays for judgment as set forth below.

**CLAIM #2: VIOLATION OF MEDICARE RIGHTS & PROTECTIONS**

36. Defendant is in violation of 42 C.F.R. Section 482.43 and Title 42, United States Code, Section 1395x(ee). Medicare certified hospitals must assist patients in arrange care needed after discharge.

37. Defendant has engaged in discharge practices that are unscrupulous at best, and contrary to its duty to advocate and protect its patients. Defendant has also failed to ensure that Plaintiff's discharge plan is consistent with Plaintiff's goals, treatment preferences, care needs, and acuity.

38. Defendant also violated Original Medicare Rule 42 C.F.R. 405.1206 by depriving Plaintiff his right to appeal the hospital discharge.

39. Specifically, on or about December 13, 2024, Plaintiff and Plaintiff's representative was notified that discharge was "tentatively" scheduled for December 30. Under the Medicare rules, Plaintiff has the right to appeal a hospital discharge to Livanta, the Quality Improvements Organizations (QIO), the by no later than the planned discharge date and before leaving the hospital.

40. On December 26, 2024, Defendant presented Plaintiff with a, "Detailed Notice of Discharge", as well as the, "IMPORTANT MESSAGE FROM MEDICARE" form at approximately 1:30pm. During the meeting, Plaintiff was presented these forms and asked if he would like the hospital to assist him with the appeal. Plaintiff declined. Defendant had previously asked Plaintiff if he would like the hospital to assist with his appeal. He declined those offers as well.

41. Defendant did not have approval or authorization to file a Medicare hospital discharge appeal on Plaintiff's behalf. Yet, thirty (30) minutes after the meeting, they filed it anyway, according to information provided by the QIO.

42. Defendant filed an appeal on behalf of Plaintiff without his consent and approval and in direct opposition to his clear and express verbal declination.

43. The QIO read the appeal to Plaintiff and his representative and what was filed was grossly incomplete and failed to capture critical, specific information regarding Plaintiff's post-acute care needs and concerns, including Plaintiff's concerns that there is no one in the home available to provide 24/7 skilled nursing and rehabilitation.

44. On December 27, 2024, Plaintiff's representative sent an email to Defendant requesting copies of all documents provided to QIO. Defendant referred Plaintiff's representative to Plaintiff's medical file and to the FOIA office. In the same email, Defendant advised that

the QIO had reviewed Plaintiff's discharge plan and agreed with Defendant's termination of hospital services.

45. On December 27, 2024, Plaintiff's representative sent another email to Defendant to request the name and contact information for Defendant's legal counsel. In response to the email, Plaintiff's representative was sent the QIO final determination letter stating that the physician reviewer agreed with the termination of services. The appeals information provided did not mention or include the appeal filed by Defendant that stripped him of his Medicare appeal rights. In the same email Defendant stated that Counsel requested that Plaintiff's representative be referred to Patient Relations.

46. Later that day, Plaintiff's "appeals packet" was delivered directly to Plaintiff. The appeals packet provided to Plaintiff did not mention or include the unapproved QIO appeal filed by Defendant that stripped him of his Medicare appeal rights.

47. On December 28, 2024, Plaintiff's representative was advised by the QIO that since the appeal had already been processed, Plaintiff was unable to rescind it.

48. Plaintiff was not afforded a notetaker for any discharge related meetings initiated by Defendant on December 26 and December 27, 2024, despite multiple requests for a notetaker for these meetings.

49. The extreme and unlawful measures taken by Defendant to impede Plaintiff's progress and overall wellness is alarming and warrants judicial review and intervention.

WHEREFORE, Plaintiff has been damaged and prays for judgment as set forth below.

**Claim #3: UNLAWFUL DISCRIMINATION**

**(In violation of Original Medicare, ACA Section 1557, ADA, Section 504 Rehabilitation Action of 1973, California Unruh Civil Rights Act, California Disabled Persons Act and California Code Section 11135)**

50. On or about November 19, 2024, and continuing, Plaintiff has requested to be accommodated with a notetaker for all case management meeting and discharge discussions. Defendant has failed to consistently accommodate Plaintiff's requests and has failed to provide Plaintiff with the notes from the meetings, providing only summaries. The summaries provided to Plaintiff failed to fully incorporate Plaintiff's objections and concerns.

51. On more than one occasion during his most recent hospital stay, Defendant told Plaintiff that his wounds were chronic and his condition was "baseline", and that essentially would not improve so he might as well go home and skip rehabilitation treatment altogether.

52. On more than one occasion during his most recent hospital stay, Defendant initiated referrals for post-acute care that misrepresented Plaintiff's care needs, health status, physical abilities and disabilities, mobility status, and therapy goals, or any combination thereof, to the detriment of Plaintiff.

53. Defendant previously failed to provide reasonable accommodation. In 2022 and 2023, Defendant failed to provide adequate therapy services, threatened unsafe and involuntary discharge, and discharged Plaintiff to Arizona with no infusions, no active prescriptions, and no follow-on care. Prior to discharge, Plaintiff requested an accommodation to transfer to Defendant's Mount Zion location where many longer-term patients are accommodated, but the request was denied. Defendant related that the denial was due to staffing shortages and his complex wound care.

WHEREFORE, Plaintiff has been damaged and prays for judgment as set forth below.

### Claim #4: VIOLATION OF THE 14TH AMENDMENT

54. The Due Process Clause of the 14th Amendment provides procedural protections, including notice and a hearing, before depriving individuals of publicly funded medical insurance.

55. Plaintiff is a dual-eligible beneficiary under both Medicare and Medicaid and has requested access to his Medicare and Medicaid benefits for this hospital stay.

56. Since September 10, 2024, and continuing, Defendant has refused to access Plaintiff's Medicare and Medicaid benefits for his hospital stay, which deprives Plaintiff of his publicly funded medical insurance without due process of law.

57. Finally, Defendant's deprivation of Plaintiff's Medicare appeal rights as described under Claim #2 above, is also violative of Plaintiff's 14th Amendment rights to due process and equal protection.

WHEREFORE, Plaintiff has been damaged and prays for judgment as set forth below.

### **PRAYER FOR RELIEF**

58. Plaintiff respectfully requests this Court to issue an *Ex Parte* Temporary Restraining Order until he is able to locate safe and suitable placement.

59. Plaintiff respectfully requests an emergency preliminary order to enjoin the premature termination of Plaintiffs hospital stay.

60. Plaintiff respectfully requests this Court issue a finding against Defendant for discrimination, harassment, violations of state and federal laws, and the United States Constitution.

61. For economic damages.

62. For non-economic damages for pain, suffering, loss of enjoyment of life.

63. For attorneys' fees and costs of suit as provided by law.

64. For prejudgment interest as provided by law.

65. Plaintiff demands trial by jury trial of all matters so triable.

                                                Respectfully submitted,

DATED: December 29, 2024

                                                /s/ Rhonda Lunsford
                                                Rhonda Lunsford, Esq.